J. K. SOCIAL CLUB

v.

J. K. REALTY CORP.

No. 80–12–Appeal.

Supreme Court of Rhode Island.

July 9, 1982.

Oster, Groff & Prescott, George M. Prescott, Lincoln, for plaintiff.

Michael F. Horan, Pawtucket, for defendant.

## OPINION

SHEA, Justice.

The plaintiff, J. K. Social Club (the club), appeals from the dismissal of its prayer for equitable relief pursuant to Rule 41 of the Superior Court Rules of Civil Procedure by a trial justice of the Superior Court. We sustain the dismissal of the equitable claims but remand for a limited determination concerning an alleged debt owed to the club.

The case was tried on an amended complaint containing three counts, each of which requested equitable relief against defendant J. K. Realty Corporation (the corporation). The case involves the legal and beneficial ownership of a building located at 621 Main Street in Pawtucket, Rhode Island. The club uses the building for its gatherings. Legal title to the building is in the corporation. The corporation is considering a sale of the building, and the club claims it is entitled to the proceeds of any sale.

In the first count of the amended complaint the club seeks to impose upon the corporation a resulting trust in favor of the club with the building to become the trust property. In the second count the club alleges that it is entitled to an equitable lien or equitable mortgage upon the real estate for improvements and renovations made to the interior of the building and paid for with club funds. The third count requests imposition of a constructive trust upon the building in favor of the club.

The club is a Rhode Island nonbusiness corporation that was established in 1933 for the expressed purpose of "assisting each [member] to act in a just, equitable manner to one another; aiding and assisting one another in sickness and adversity; encouraging the highest standard of morality among our members, and avoiding all that is disreputable or liable to demean the members or lower the dignity of this club." Its quarters have been and are presently located at 621 Main

Street in Pawtucket, Rhode Island. The club itself never owned this property. Instead, it has always leased space from the owner. The question of ownership of the property gives rise to this controversy.

Records of the organization which were in evidence indicate that in 1947, the club officers and members learned that their then landlord intended to sell the property. The club entered into negotiations with the landlord for the purchase of the property. On March 24, 1947, the club appointed a committee to deal with the landlord and authorized it to offer him $15,500. Apparently, the committee reached a satisfactory agreement with the landlord, and on April 7, 1947, the club decided to "place a substantial binder" with a real estate broker.

The club itself, however, did not make the purchase. Instead, at a special meeting on April 21, 1947, the members decided to form the corporation for the purpose of buying the property. All persons who were then members of the club were to be incorporators.

Nothing in the record indicates exactly why the club members decided that the club itself would not or should not purchase the property in its own name. The corporation was duly formed, and the sale was consummated. The corporation received title to the property on May 15, 1947. The total outlay of funds was $16,475, including $15,700 as the purchase price and $775 as a brokerage commission. The real estate agent, Herbert I. Mathewson, retained a mortgage on the property in the amount of $12,000. The balance of the price was paid with the club's funds.

The club contributed money toward the purchase of the property by means of a capital contribution to the corporation. On May 5, 1947, the corporation had issued 90 shares of stock to the club in exchange for the capital contribution. Over the next two years, until July 11, 1949, the club made additional purchases of the corporation's stock until the club owned 270 shares having a value of $13,500.

In June 1950, the club, as sole stockholder, caused all of its shares to be redeemed by the corporation. Thereafter, each club member was individually reissued one share of the corporation's stock. At that time there were eighty-one members of the club. At the same meeting the corporation by-laws were amended to provide that each stockholder of the corporation would be entitled to one vote per share and that membership in the club was a prerequisite to exercising one's right to vote upon corporate matters.

Since 1950 the corporation has issued no new stock, either to pre-1950 members or to members who have since joined. At the time this case was tried, twenty-three shares were held by active club members. Thirty-two shares were in the hands of the estates or heirs and beneficiaries of deceased club members. The remainder of the shares had been retired. At the time of the trial there were 139 club members. The evidence therefore suggests that 116 club members have no ownership interest in the corporation.

In the early 1950s the club undertook renovations and additions to the building owned by the corporation. The club hired an architect, solicited bids, gave out the contracts and authorized the work. The corporation acquired a bank loan in the amount of $25,000 to cover the cost. The club, however, advanced funds to the corporation to pay for the construction when the loan was exhausted.

At the trial, club members who were also stockholders of the corporation admitted that the corporation was and continues to be indebted to the club in the amount of $15,510.78. They also admitted the corporation's plan to sell the property. The proceeds from the sale would be divided among all of the shareholders, including the twenty-three club members and the thirty-two estates and beneficiaries. Before such distribution, however, the sale proceeds would be applied to pay off the corporation's debt to the club.

Upon completion of the club's presentation of evidence, the corporation moved for dismissal of the suit pursuant to Super.R.

Civ.P. 41(b)(2). The trial justice granted the motion. He specifically found that the facts were insufficient to justify the imposition of either a resulting or a constructive trust upon the building. He also dismissed that count of the club's amended complaint that requested relief in the form of an equitable lien upon the property. While finding that a debt was indeed owing to the club, the trial justice ruled that since there was an adequate remedy at law for its collection, equitable relief would be inappropriate.

Rule 41(b) provides for the involuntary dismissal of jury-waived cases. Rule 41(b)(2) states:

> "*On Motion of the Defendant.* On motion of the defendant the court may, in its discretion, dismiss any action for failure of the plaintiff to comply with these rules or any order of court or for lack of prosecution as provided in paragraph (1) of this subdivision. After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff the court shall make findings as provided in Rule 52(a)."

In ruling on such a motion, the trial justice may either determine the case on the record as it exists at the time the defendant files his motion or defer his judgment until both parties have completed their presentations of evidence. The trial justice sits as a trier of the facts as well as of law. Consequently, he weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences. He need not view the evidence in a light most favorable to the plaintiff.

If after examining the evidence the trial justice is convinced that it preponderates against the plaintiff, then he may grant the defendant's motion to dismiss. Furthermore, given the trial justice's responsibilities, the duty of this court on review is clear. We must determine whether the trial justice's findings are supported by the evidence or whether in making such findings he has overlooked or misconceived material evidence. If the trial justice has made supportable findings, we must then determine whether or not he has applied the correct rule of law. *Judd Realty, Inc. v. Tedesco,* R.I., 400 A.2d 952, 955 (1979); *Emerson Radio of New England, Inc. v. DeMambro,* 112 R.I. 300, 305, 308 A.2d 834, 838 (1973).

The club first claims that the trial justice misconceived or overlooked the material evidence when he found no basis in fact to impose either a resulting or a constructive trust upon the property.

The club argues that a resulting trust is presumed to arise in its favor because it provided a portion of the purchase money when the corporation took legal title to the building in 1947. However, a mere general monetary contribution by itself will not establish a resulting trust.

> "There must be clear, full and convincing evidence that *at the time of the conveyance* it was the intention and understanding that the contributor was to have the beneficial ownership in the whole or in a definite fractional part." (Emphasis original.) *Desnoyers v. Metropolitan Life Insurance Co.,* 108 R.I. 100, 111, 272 A.2d 683, 689 (1971) (quoting *Cutroneo v. Cutroneo,* 81 R.I. 55, 59, 98 A.2d 921, 923 (1953)).

The evidence was not clear and convincing that at the time of the original purchase the club intended to retain any beneficial interest. As the trial justice noted, the evidence does show that initially the club planned to buy the building. Then, without explanation, the club decided to form the corporation for the purpose of making the purchase. We point out further that after the corporation had purchased the building, the

club's status as tenant in the building and the requirement that it continue to pay rent remained unchanged. Furthermore, there was no evidence that in 1950, when shares of stock were reissued to individual club members and the corporate bylaws were amended to predicate voting rights upon club membership, there was a specific connection between mere club membership and enjoyment of a beneficial interest in the corporation's property. There was no evidence that membership after this time included automatic rights in new members to receive corporate stock and an ownership interest.

■ Neither is the club entitled to benefit from imposition of a constructive trust. A constructive trust is an equitable remedy that a court may impose upon the parties, in the absence of their actual intent to create a trust, in order to avoid the unjust enrichment of one party at the expense of another. In such a case equity will act when one party obtained legal title to property either by fraud or in violation of a fiduciary relationship or when the recipient of confidential information acts upon such information to the detriment of the one who disclosed it. *Cahill v. Antonelli*, 120 R.I. 879, 882, 390 A.2d 936, 938 (1978); *Matarese v. Calise*, 111 R.I. 551, 564, 305 A.2d 112, 119–20 (1973); *Desnoyers v. Metropolitan Life Insurance Co.*, 108 R.I. at 111, 222 A.2d at 690.

The club argues that a constructive trust is justified on grounds of either fraud or breach of a fiduciary duty. We conclude that no basis in fact exists to support the club's position.

■ As the trial justice stated, there is no clear and convincing evidence in the record that the corporation perpetrated a fraud upon the club. For fraud to lead to the creation of a constructive trust, the evidence must show that the holder of legal title procured title through fraud. There must be an actual misrepresentation of present intent. *Lawrence v. Andrews*, 84 R.I. 133, 139, 122 A.2d 132, 135–36 (1956). In the instant case no such misrepresentation occurred. The parties then involved

were aware of the situation when the club formed the corporation in 1947. Moreover, since each club member was to act as an incorporator, it is difficult to see how they could have committed a fraud against themselves. The members today are in the same position and have no rights superior to the rights of the members who were involved in the original transaction.

■ Nor can it be said that there was a breach of a fiduciary duty on the part of the corporation. The club bases this theory of breach upon the statement of the club's fraternal purposes found in its articles of association. However laudatory the club's fraternal purposes may be, they do not rise to the level of a fiduciary relationship in the law. The articles of association do not compose a legally enforceable contract. Nor does the evidence establish the existence of any other agreement or agency relationship upon which to base a fiduciary duty.

■ The club's final argument asserts its right to an equitable lien on the property as a result of funds it contributed to the building's renovation. This claim lacks merit. Since an adequate remedy at law exists which would allow the club to recover a debt owed to it, relief in equity is inappropriate.

■ The club, in a postjudgment motion granted by the trial justice, amended its complaint a second time by adding a legal claim for the debt. The club also moved for an amendment of the judgment in order that it reflect the money actually owed to the club. While the trial justice granted the club leave to amend its complaint under Super.R.Civ.P. 15(b), he refused to amend his judgment on the equity counts, regarding it as improper because a legal claim would best address the club's rights as a creditor, and there was no answer from the corporation addressing the new count for recovery of the debt. Also documentary evidence raised a question concerning the exact amount due, since the club was apparently supposed to enjoy a rent rebate from the corporation beginning in 1959, the rebated amounts to apply to the corporation's

debt to the club. No evidence had been taken at the trial about any reduction of the debt by means of the rebate, although there was some testimony that the amount of the debt had not been reduced through the years.

We conclude that in denying the motion to amend the judgment, the trial justice was correct but only insofar as the claims for equitable relief were concerned. However, it was incorrect for the trial justice not to retain jurisdiction to determine the parties' rights under the new count for debt. When the trial justice granted the amendment after rendering his judgment in equity, he allowed into the case an entirely new claim. He then had before him the legal claim that he stated was necessary in order to adjudicate the matter properly. Rather than dismiss the case, he should have allowed the parties their day in court on the new count, which was a legal claim for which no jury trial had been sought. He should have specifically directed the corporation to file an answer and then have heard testimony to resolve the evidentiary contradictions that already existed about the exact amount, if any, that was still due. For purposes of appeal the trial justice could have chosen to certify the club's equitable claims under Rule 54(b) or to simply leave the parties to their rights on appeal once the legal claim was disposed of.

In actual fact, within several days after the trial justice entered judgment and made rulings on the club's motions, both the club's amendment and the corporation's answer were filed. The action for debt is currently left in midstream. Therefore the only appropriate course is to remand that part of the case dealing with the amended count for a proper determination of the parties' rights.

The plaintiff's appeal concerning the denial of its equitable claims is denied and dismissed. The case is remanded to the Superior Court for the limited purpose of determining whether a debt still exists and, if so, the amount of the debt. Following that determination, judgment may enter below.